IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT ANCHORAGE
* * * * *

NAI SAEPHAN, AS PERSONAL      )
REPRESENTATIVE FOR THE ESTATE )
OF ANN SAEPHAN,               )
                              )
          Plaintiff,          )
                              )
     vs.                      )  CASE NO.: 3AN-05-13024 CI
                              )
CHARLES OLIVO,                )
                              )
          Defendant.          )
_____)

DEPOSITION OF CHARLES OLIVO,
Taken on Thursday, June 22, 2006
At 12:00 o'clock p.m.
At 3700 West Flamingo Road
Las Vegas, Nevada

Reported By:  Christine M. Jacobs, RPR, CCR 455

Esquire Deposition Services          3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                      (866) 462-2785                        Fax (702) 699-7138

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                          June 22, 2006

---

**Page 2**

```
1   APPEARANCES
2   For the Plaintiff:  DOUGLAS G. JOHNSON, ESQ.
                        LAW OFFICES OF DOUGLAS G. JOHNSON
3                       701 West 8th Avenue, Suite 1100
                        Anchorage, Alaska  99501
4
    For the Defendant:  JONATHAN A. KATCHER, ESQ.
5                       POPE & KATCHER
                        421 West 1st Avenue, Suite 220
6                       Anchorage, Alaska  99501
7   For Leader Insurance Company:
8                       REBECCA J. HOZUBIN, ESQ.
                        WILKERSON HOZUBIN
9                       310 K Street, Suite 405
                        Anchorage, Alaska  99501
10
11
12
13            I N D E X
14  Witness          Direct  Cross  Red.  Rec.
15  CHARLES OLIVO
16  (By Mr. Johnson:)        3
17
18        E X H I B I T S
19  Number      Description           Page
20
    1 Defendant's Rule 26(a) Initial Disclosures,
21  Letter from Infinity to Charles Olivo ............6
22  2 Hand-drawn diagram of parking lot ...............34
23
24
25
```

**Page 3**

```
1   Thereupon,
2              CHARLES OLIVO
3   was called as a witness by the Defendant and, having been
    first duly sworn, testified as follows:
4
5              EXAMINATION
6   BY MR. JOHNSON:
7       Q.  Mr. Olivo, thanks for being here today.  I'm
8   Doug Johnson.  I represent Ann Saephan's family, her
9   estate.  Have you ever had your deposition taken before?
10      A.  No.
11      Q.  I'm sure that Mr. Katcher has explained how this
12  whole thing works.  Basically, I'm going to ask you
13  questions; you'll answer.  The court reporter is going to
14  try and take everything down, and that way later on, if
15  we need to, we can have it transcribed and have a written
16  version of what happens here.
17      If you have any questions about anything that I ask
18  or something doesn't seem clear, tell me, and I'll try to
19  clarify what I'm looking for.  If you need to take a
20  break, by all means, if you want to talk to Mr. Katcher,
21  by all means say "time out," and we'll find some place
22  else to be for a few minutes.
23          MR. JOHNSON:  Let's see.  If -- well, let me ask
24  about Leader Insurance.  Rebecca Hozubin, Ms. Hozubin is
25  here for leader.  I assume you're here for Leader today?
```

**Page 4**

```
1           MS. HOZUBIN:  Yes.
2       Q.  (By Mr. Johnson)  Have you had any contact with
3   anybody from Leader Insurance since the incident when Ann
4   was killed happened?
5       A.  Yes.
6       Q.  And when was that?
7       A.  Let me see.  About a couple days or a week from
8   when it happened, I just called them about my insurance
9   and canceling it.  That's about it.
10      Q.  And at that time did anybody talk to you about
11  what had happened that night when Ann was killed?
12      A.  Yes.
13      Q.  And do you remember who it was that you talked
14  with?
15      A.  No, sir.
16      Q.  Was it a man or a woman?
17      A.  I believe it was a woman.
18      Q.  Okay.  Did she take a recorded statement where
19  she asked you questions and recorded your answers?
20      A.  That I don't remember.
21      Q.  Was this a telephone conversation?
22      A.  Yes.
23      Q.  And other than that particular phone call, have
24  you had any other contact with anyone from Leader since
25  then?
```

**Page 5**

```
1       A.  No.
2       Q.  Do you remember -- let's see.  You may have just
3   said this.  Did you say this was a couple of days after
4   the incident occurred that you called them?
5       A.  Yes.  I believe it was about a couple days or a
6   week or so.
7       Q.  And do you remember what was communicated during
8   that conversation?
9       A.  I was just explaining to them that I won't be
10  needing the insurance anymore since my vehicle had been
11  impounded for evidence, and I wouldn't be able to drive
12  it anymore, and I believe they asked why, and I explained
13  somewhat a little bit of what happened.
14      Q.  Have you had any contact prior to date with Miss
15  Hozubin or anybody from her office?
16      A.  No.
17      Q.  Okay.  And have you had conversations with Miss
18  Hozubin today?
19      A.  Just a hello.
20      Q.  Other than say hello, okay.  All right.  Let me
21  ask you this.  Have you asserted any of your own claims
22  for compensation from your insurance company for what
23  happened that night when Ann was killed?
24      A.  I don't remember.
25      Q.  Okay.  Have you been informed that you may be
```

---

Esquire Deposition Services          3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                        (866) 462-2785                     Fax (702) 699-7138

2  (Pages 2 to 5)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo

June 22, 2006

Page 6

1    entitled to compensation under your own insurance policy
2    for harm that you may have suffered in that incident?
3    **A. That I don't remember either.**
4         MR. JOHNSON: There's a letter that has been
5    produced in this case. Well, let me -- let's mark this
6    the first exhibit.
7         (Exhibit 1 was marked for identification.)
8    Q. (By Mr. Johnson) During a case like this, each
9    side exchanges information that may be relevant to the
10   issues in the case, and that's called the disclosures.
11   Your attorney has provided us with what's called initial
12   disclosures, and with the initial disclosures is a
13   letter. I'm going to hand that to you. This is all part
14   of Exhibit No. 1. Let me ask you if you have seen that
15   letter before.
16   **A. Yes, I remember seeing this letter.**
17   Q. You recognize that. Okay. When did you see
18   that before?
19   **A. Let me see. Not really sure, but I just**
20   **remember it was around the time when this happened.**
21   Q. And for identification, we're looking at a
22   letter that's apparently from Infinity dated January 27,
23   '04; is that correct?
24   **A. Uh-huh.**
25   Q. Okay. When you received this letter from Leader

Page 7

1    or Infinity, the insurance company, did you discuss it
2    with Leader or Infinity about the contents of the letter
3    or anything what was going on with it?
4    **A. No, I didn't.**
5    Q. I guess I should have asked did you receive it
6    in the mail, or did you -- I don't want to hear what you
7    and your attorney have talked about at any point, but I
8    was just wondering how you received the letter. Do you
9    know where it came from?
10   **A. Yes, it came from the mail.**
11   Q. Okay. Do you think it was mailed from the
12   insurance company or from your attorney, I guess, is what
13   I'm asking.
14   **A. From the insurance company.**
15   Q. Okay. Well, when you read that and having read
16   it, is it your understanding that Leader Insurance is
17   attempting to avoid coverage for you and Ann by denying
18   that this was a drive-by shooting? Are you aware of that
19   fact?
20        MR. KATCHER: Well, objection to form.
21   Compound. It's a -- there's so many suppositions in the
22   question I'm not sure where to begin.
23   Q. (By Mr. Johnson) That's fine. Go ahead if you
24   can answer. And if you're not aware, that's a fair
25   response.

Page 8

1         MR. KATCHER: I just want to interpose to the
2    extent that he may be inclined to, he should not give any
3    information that would be based upon conversations that
4    he and I have had about the coverage situation.
5    Q. (By Mr. Johnson) Fair enough. And let me kind
6    of explain my view, and if your attorney wants to correct
7    for you what I'm about to say, that's certainly his
8    prerogative.
9         I don't want to know what you and Mr. Katcher have
10   talked about. That's not why we're here today. What I
11   want to know is what your understanding of the facts and
12   the situation are. Okay? Does that make sense?
13   **A. Uh-huh.**
14   Q. Are you aware that Leader has filed a suit in
15   federal court regarding the coverage saying that
16   basically if the shooters did not use a motor vehicle
17   that night, then they do not have to provide coverage?
18   At least that's part of the lawsuit. Are you aware of
19   that fact?
20   **A. No.**
21   Q. Okay. Well, what's your understanding of why
22   Leader -- well, do you understand Leader is contesting
23   whether or not there's coverage in the case?
24   **A. Yes.**
25   Q. And what's your understanding of their basis for

Page 9

1    contesting coverage?
2         MR. KATCHER: And I think part of the difficulty
3    is that to the extent that -- my understanding is his
4    complete understanding of that particular element of the
5    case comes from me. So you might ask him other than
6    information that he's learned from me in conversations
7    with me does he have any other source of information
8    about the dispute between Leader and the Saephan estate.
9         MR. JOHNSON: Our understanding of the privilege
10   is slightly different. Understanding or knowledge of a
11   witness I do not believe is privileged. It's specific
12   communications between the witness and his attorney are
13   privilege.
14        MR. KATCHER: Yeah, but if that understanding is
15   gleaned solely from things his lawyer told him, then I
16   think the privilege does apply.
17        MR. JOHNSON: Well, I disagree on that, but we
18   can set that aside.
19        MR. KATCHER: We can get around it. I just
20   don't want him telling you, you know, I think it's more
21   than him saying my lawyer told me this. And because
22   coverage is a pretty nuanced phenomenon, I don't think a
23   laymen would understand unless his lawyer told him
24   anyhow.
25        MR. JOHNSON: And we're not going very far down

Esquire Deposition Services          3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                    (866) 462-2785                       Fax (702) 699-7138

3  (Pages 6 to 9)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                    June 22, 2006

---

Page 10

1  this road.
2       MR. KATCHER: Okay.
3       MR. JOHNSON: Just trying to set the parameters
4  and understand where we're at.
5       MR. KATCHER: Understood.
6    Q.  (By Mr. Johnson) At any rate, it's an important
7  issue in this matter of how the shooting occurred and
8  whether or not motor vehicles were involved. Okay? And
9  so we're going to try to discuss that today. Does that
10 make sense? Those are the issues that I'm interested in
11 in what you know about. Okay?
12   A.  Okay.
13   Q.  Do you remember the day that Ann was killed?
14   A.  November -- I don't remember.
15   Q.  Do you remember the -- other than the date or
16 which day of the week, do you remember the day in
17 general, you know, like what happened that day?
18   A.  Like what I remember from that night what
19 happened?
20   Q.  Sure. I assume you remember that night; right?
21   A.  Yes.
22   Q.  And what time of night was it when this incident
23 occurred? Do you recall?
24   A.  I believe when the incident happened was about
25 9:00 o'clock maybe.

---

Page 11

1    Q.  Okay. When was it decided that Ann would be in
2  your car that night?
3    A.  Fifteen minutes before 9:00.
4    Q.  Fifteen minutes before 9:00?
5    A.  9:00.
6    Q.  Okay. How did you know Ann, by the way?
7    A.  Through some friends.
8    Q.  Okay. Can you just describe generally what type
9  of relationship this was? Were you friends? Were you
10 romantically involved? I mean what was this
11 relationship?
12   A.  Just friends.
13   Q.  Just friends?
14   A.  Basically, we can't even say friends. More like
15 an acquaintance.
16   Q.  Okay. When did you first meet her?
17   A.  About eight months ago or eight months from
18 when --
19   Q.  Prior to when this incident occurred?
20   A.  Right.
21   Q.  Well, can you remember earlier in the day that
22 this happened? And I don't remember what day of the week
23 it was. Do you happen to recall?
24   A.  I believe it was Friday.
25   Q.  Friday. Okay. So earlier on that Friday, what

---

Page 12

1  was happening in your day? What did you do earlier that
2  day?
3    A.  Well, I woke up. I had breakfast, and we all
4  decided to hang out, and we met at the Space Station.
5    Q.  Let me interrupt you for a second. When you say
6  we all decided, who is we?
7    A.  Me, couple friends, and let me see. Ann, her
8  cousin, and her cousin's boyfriend.
9    Q.  Let me see if I can get some names from you.
10 You said Ann --
11   A.  Uh-huh.
12   Q.  -- and her cousin. And do you remember her
13 cousin's name?
14   A.  Lui, Lai.
15   Q.  Is it Lai perhaps?
16   A.  Yeah.
17   Q.  We talked to a young lady named Lai in this
18 case.
19   A.  And her boyfriend's name -- I don't know her
20 boyfriend's name.
21   Q.  And who else?
22   A.  Caposan.
23   Q.  I'm sorry?
24   A.  Caposan.
25   Q.  Caposan?

---

Page 13

1    A.  Uh-huh. Donny and Lavelle and Steven.
2    Q.  Anybody else?
3    A.  That's it. And, well, we met at the Space
4  Station, and we were just going to go hang out and my car
5  just got shot.
6    Q.  When was it determined that you would meet at
7  the Space Station?
8    A.  I'd say about -- I think it was 7:30.
9    Q.  About 7:30? Okay. And where were you when that
10 decision was made?
11   A.  I was at, let's see, at some gas station at
12 Debar and Bragaw, I believe.
13   Q.  Okay.
14   A.  And we called each other and we asked to meet at
15 the Space Station. She wasn't there. My friend calls
16 and tells me to go meet up with him.
17   Q.  Who was that?
18   A.  Donny.
19   Q.  Is it the same Donny you mentioned?
20   A.  Yes.
21   Q.  Do you remember the last name?
22   A.  Abbott.
23   Q.  So Donny called you on your cell phone I assume?
24   A.  No, it wasn't my cell phone. It was Caposan's
25 cell phone.

---

Esquire Deposition Services          3900 S. Paradise Road Suite 156       Las Vegas, Nevada 89109
Phone (702) 699-5455                    (866) 462-2785                      Fax (702) 699-7138

4 (Pages 10 to 13)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                          June 22, 2006

**Page 14**

1   Q.  Caposan's cell phone?  Okay.
2   A.  Uh-huh.  And so he calls me.  I meet up with him
3  at Northway Mall.  That's when Ann calls me and says,
4  hey, where are you guys at?  I said, oh, we were just
5  there but you weren't there, so we left.  And she's like,
6  okay, I'll come back.  We're here now.  And then I said
7  all right.
8      So we go back over there and we hang out for a
9  couple minutes.  Or not couple minutes, sorry, but for a
10  while, and she leaves the gas station, or the Space
11  Station, sorry.  And she goes to the gas station actually
12  to get a pack of cigarettes I believe.
13      So we're waiting at the Space Station for a while,
14  and she finally comes back like an hour later or 45
15  minutes later, and that's when we were deciding what
16  we're going to do to kill time because we had other plans
17  for later, and --
18   Q.  Who is we?
19   A.  All of us that was there.
20   Q.  Including Ann?
21   A.  Uh-huh.
22   Q.  What were the plans for later?
23   A.  To go hang out with some friends at Diamond Mall
24  or meet up at Diamond Mall and we would hang out.
25   Q.  Let me make sure I'm on track so far.

**Page 15**

1   A.  Okay.
2   Q.  You had intended to meet Ann and Lai I guess?
3   A.  Right.
4   Q.  At the Space Station?
5   A.  Uh-huh.
6   Q.  When you got there, they weren't there?
7   A.  Uh-huh.
8   Q.  And you got a call from Donny Abbott --
9   A.  Yes.
10   Q.  -- saying come over to the Northway Mall?
11   A.  Yes.
12   Q.  You were there for a while and you got a call
13  from Ann.  She said that she was back at the Space
14  Station now?
15   A.  Uh-huh.
16   Q.  So you guys drove over?
17      MR. KATCHER:  Let me just interrupt.  You should
18  say yes or no.  Uh-huh makes it hard for the court
19  reporter.
20      THE WITNESS:  Okay.
21   Q.  (By Mr. Johnson)  So you guys drove back over to
22  meet Ann and --
23   A.  Yes.
24   Q.  -- her group there at the Space Station.  Prior
25  to meeting up with Ann there, who was in your vehicle

**Page 16**

1  that night?
2   A.  That I don't remember who was because we all
3  kind of, you know, took some people in my car and took
4  some other people in Donny's car.
5   Q.  So there were two vehicles basically earlier
6  on?
7   A.  That's correct.
8   Q.  Yours and Donny Abbott's?
9   A.  Yes, that's correct.
10   Q.  And was Caposan -- is that how you say that?
11   A.  Caposan.
12   Q.  Caposan.  Was he with you during that time
13  period?
14   A.  Yes, he was.
15   Q.  And Lavelle and Steven as well?
16   A.  Yes, they were all with us.  But like I said,
17  they were in separate, like, I don't remember who was in
18  whose car, but we were all together.
19   Q.  All right.  And so back at the Space Station Ann
20  went across the street to the gas station for something?
21   A.  I don't know if she went across the street or if
22  she went across Halftown, you know.  That I don't know
23  because we were inside and she said, oh, we're going to
24  go to the gas station.  We'll be back in a couple
25  minutes.  She takes more than a couple minutes.

**Page 17**

1   Q.  Who is she with at that point?
2   A.  With her cousin and then her cousin's
3  boyfriend.
4   Q.  Okay.  And the cousin is Lai?
5   A.  Lai.  That's correct.
6   Q.  Do you know if they drove somewhere or if they
7  walked?
8   A.  That I don't know.
9   Q.  All right.  Okay.  Did anything happen at the
10  Space Station?  Any confrontations with anybody or
11  disputes with anybody while Ann was gone?
12   A.  No.
13   Q.  So then what happened?
14   A.  We were just waiting for her to come back, and
15  we were talking again about what should we do to kill
16  time, so we decided let's go cruise around to kill a
17  couple hours.  And she finally comes back.  That's when
18  she asked me if she wanted me to drive or -- yeah, if she
19  wanted to drive my car.  And I said no.  That's fine.
20  I'll drive.  And then her cousin asked, oh, does Donny
21  want me to drive his car?  And that's when I asked Donny
22  if, you know, if he wanted to Lai to drive his car and he
23  said no.  It's fine.  I'll drive also.
24      And she got in my vehicle, and Steven got in my
25  vehicle, and he was behind Ann in the back seat.  And the

Esquire Deposition Services        3900 S. Paradise Road Suite 156        Las Vegas, Nevada 89109
Phone (702) 699-5455                 (866) 462-2785                       Fax (702) 699-7138
                                                                          5  (Pages 14 to 17)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                    June 22, 2006

## Page 18

1  rest got in Donny's car except Caposan. Caposan was
2  still inside the Space Station, and a couple minutes
3  later, the car just got shot.
4     Q. Were you aware of anybody looking for you or
5  your car that night?
6     A. No.
7     Q. Did you have any indication that anybody
8  anywhere might be after you or might have some sort of
9  vendetta or anything against you at that time?
10    A. No.
11    Q. Can you describe your car for me, please?
12    A. Sure. It's a 1991 Honda Civic hatchback SI,
13 red. Let me see. They didn't have tinted windows or
14 anything. It had a muffler.
15    Q. I'm sorry. What?
16    A. It had a muffler.
17    Q. A muffler. Okay. Was there any distinct
18 markings on it of any kind?
19    A. Yes. On the windshield it said Rated R Racing.
20    Q. What does that mean?
21    A. It's just a racing crew.
22    Q. Did you race?
23    MR. KATCHER: Well, racing is against the law.
24    MR. JOHNSON: Well, I suppose it depends on what
25 kind of racing.

## Page 19

1     MR. KATCHER: Really. I mean driving over the
2  speed limit he'd be admitting to, so you have to define
3  racing if you would.
4     MR. JOHNSON: I'll carefully go a short ways
5  down this path.
6     Q. (By Mr. Johnson) Were you part of some sort of
7  organized racing team or club or something?
8     A. It's not an organization. It's just friends
9  just hanging out.
10    Q. So this wasn't something on a track somewhere,
11 it was just kind of an informal thing; is that right?
12    A. Yes.
13    Q. Did you have a particular group of friends that
14 you hung out with normally? I'm not talking just about
15 the racing sign in your window. Did you have a group of
16 friends that you hung out with normally?
17    A. Not really. I had one group of friends, you
18 know, did their own thing. And then I basically got
19 along with a lot of people.
20    Q. If you were to name, I don't know, five friends
21 you hung out with the most during that time period, who
22 would they be?
23    A. Me, Donny, and tell you the truth, all I can say
24 is me and Donny. We were the only ones that always hung
25 out always.

## Page 20

1     Q. Okay. Going back to your car --
2     A. Okay.
3     Q. -- the sign you had in your window or the
4  lettering, anything else about the car that was
5  distinctive?
6     A. No.
7     Q. Was that the car that you normally drove during
8  that time period?
9     A. Yes.
10    Q. The lettering in the window you said that was on
11 the front windshield?
12    A. Yes.
13    Q. How big were the letters? And I don't care what
14 they said. I'm trying to figure out how to identify your
15 car is the reason for the question.
16    A. Let me see.
17    MR. KATCHER: Well, if I might say, you might
18 have him draw you a picture of the sticker.
19    MR. JOHNSON: That's a great idea.
20    THE WITNESS: Actually, you know how on
21 windshields there's that blue part on the upper?
22    Q. (By Mr. Johnson) On the top of it?
23    A. Uh-huh. There's that like space of like a
24 little tint, you know.
25    Q. Okay. And we're talking about the front

## Page 21

1  windshield; right?
2     A. That's correct.
3     Q. Okay.
4     A. And on top there's like a blue-greenish type of
5  tint. It was big as that. Took up all that. So like
6  this big basically, (indicating).
7     Q. That looked like what? Six inches or so?
8     A. Yeah, it's about six.
9     Q. Six inches?
10    A. Six and a half.
11    MR. KATCHER: And the letters would go from one
12 side of the windshield to the other?
13    THE WITNESS: Uh-huh. That's correct.
14    Q. (By Mr. Johnson) What color were the letters?
15    A. They were, they were gray.
16    Q. I'm sorry. I think my ears are plugged from the
17 plane. Did you say gray or green?
18    A. Gray.
19    Q. Okay. Were there other groups around town that
20 identified themselves as a racing club of some kind other
21 than the X-Rated Racing Club?
22    MR. KATCHER: You mean Rated R?
23    MR. JOHNSON: Sorry. Freudian slip.
24    MR. KATCHER: Only been here 12 hours in Vegas.
25    Q. (By Mr. Johnson) I'm sorry. What did the

Esquire Deposition Services          3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                        (866) 462-2785                          Fax (702) 699-7138
6 (Pages 18 to 21)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                                June 22, 2006

Page 22

1  letters say again, sir?
2     A.  Rated R Racing.
3     Q.  Rated R Racing.  Thank you.  Were there other
4  groups in town that identified themselves as a racing
5  group other than Rated R Racing?
6     A.  Yes.
7     Q.  Can you tell me what some of those groups were?
8     A.  AOR, Infamous.
9     Q.  AOR, Infamous?
10    A.  Uh-huh.  Let's see.  New Image.  And that's all
11 I can think of right now.
12    Q.  Do you know what AOR stands for?
13    A.  All Out Racing.
14    Q.  All Out Racing.  And were these -- well, how
15 many of those people were involved in the Rated R Racing
16 group?
17    A.  Thirty-five.
18    Q.  Thirty-five?
19    A.  Uh-huh.
20    Q.  Okay.  Any idea how many people were involved in
21 the AOR group?
22    A.  20, 25, around there.
23    Q.  And how about Infamous?
24    A.  The same amount as AOR, around there.  25.
25    Q.  20 to 25?

Page 23

1     A.  Uh-huh.
2     Q.  And New Image?
3     A.  Five.
4     Q.  And was there competition between the different
5  racing groups?
6     A.  Yes, between AOR and Infamous.
7     Q.  Okay.  How about between Rated R Racing and any
8  of the other groups?
9     A.  No.
10    Q.  What was the competition between AOR and
11 Infamous?
12    A.  From word on the streets, one guy beat the other
13 guy, and the other guy was saying that's not true, so
14 they had a little dispute over that.
15    Q.  And beat in some kind of race?
16    A.  Oh, as in race, yes.  That's correct.
17    Q.  And tell me more about the dispute that AOR and
18 Infamous had over the racing issue.
19    A.  That's all I know.
20    Q.  Were there fights between them?
21    A.  That I don't know.
22    Q.  Was there any competition between any of these
23 groups and Rated R Racing of any kind?
24    A.  No.
25    Q.  Any disputes with Rated R Racing and any of

Page 24

1  those other groups?
2     A.  No.
3     Q.  Were there any of these four groups that you've
4  mentioned that were mostly from one race or another?  For
5  example, was there an Asian racing group or a Latin
6  racing group?
7     A.  No.  They were all multi-racial.
8     Q.  And these groups -- I guess I'm trying to figure
9  out -- I frankly never heard of them before.  I don't
10 know what this is.  Is this what some people would call
11 gangs of some kind?
12    A.  No, not at all.
13    Q.  Okay.  Did these groups wear different types of
14 clothing to identify themselves as members of the group?
15    A.  No.
16    Q.  Did they all have signs on their windshields --
17    A.  Yes.
18    Q.  -- with their group name?  Okay.  Is there
19 anything else that would identify someone, for example,
20 from AOR if I was to see them downtown on a Friday
21 night?
22    A.  The person or the vehicle?
23    Q.  Well, either one.  How about the vehicle?  Let's
24 start there.
25    A.  The vehicle, yes.  Just by looking at the front

Page 25

1  windshield it would say AOR.
2     Q.  Okay.  Anything else about the vehicle that
3  would identify it as an AOR vehicle?
4     A.  No.
5     Q.  How about the person?
6     A.  No.
7     Q.  Nothing to identify?  No jacket?  No ball cap?
8     A.  No.
9     Q.  And what type of people were in these groups?
10 Was there a particular age group or?
11    A.  Not really.
12    Q.  Okay.
13    A.  If you can drive, then you can drive.
14    Q.  Did you have to own a car to be in the group?
15    A.  Yes.
16    Q.  Have you ever heard or have you ever been aware
17 of anybody from any of these groups shooting at or
18 attacking anybody from within those different groups?
19    A.  No.
20    Q.  When you say there were 35 members of the Rated
21 R Racing, is that 35 vehicles or 35 people?
22    A.  You can say about 30 vehicles and five extra
23 members that were just mechanics.
24    Q.  Was Ann a member --
25    A.  No, she wasn't.

Esquire Deposition Services                3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                             (866) 462-2785                        Fax (702) 699-7138

7  (Pages 22 to 25)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                    June 22, 2006

**Page 26**

1      Q.   -- of any of these?  How about her cousin Lai?
2   Was she a member?
3      A.   No.
4      Q.   Or her boyfriend?
5      A.   No, not that I know of.
6      Q.   Was anybody else with you the night that Ann was
7   Killed?  Was anybody else a member of these groups?
8      A.   Yes, Donny.
9      Q.   Donny Abbott.  Okay.  Was he part of the Rated R
10  Racing?
11     A.   Yes.
12          MR. JOHNSON:  Let's go off the record.
13          (Break was taken.)
14     Q.   (By Mr. Johnson) Mr. Olivo, other than some
15  anonymous people who may be involved, may have been
16  involved with going fast in their cars, were there any
17  other illegal activities going on between these groups?
18     A.   No.
19     Q.   Going back to the night that Ann was killed,
20  were you looking for anybody else that night?  Were you
21  trying to find anybody else that night other than the
22  group of folks we talked about?
23     A.   No.
24     Q.   At one point you had mentioned that, I think,
25  Caposan called Donny's cell phone?

**Page 27**

1      A.   Yes.  Or Donny called us.
2      Q.   Donny called Caposan's cell phone?
3      A.   Uh-huh.
4      Q.   Did you also have a cell phone that night?
5      A.   No, I didn't.
6      Q.   Did anybody else call the group that you were
7   with that night trying to link up with you or find you?
8      A.   Yes, I received another call from this guy named
9   Chico.
10     Q.   And who's Chico?
11     A.   Just somebody we used to hang out with.
12     Q.   Do you know Chico's last name?
13     A.   No, I don't.
14     Q.   And what did Chico say when he called?  Was he
15  trying to find you guys?
16     A.   Yes, he wanted to hang out, but we said no.  We
17  got our car packed.
18     Q.   Did Chico tell you anyone was trying to find you
19  that night?
20     A.   No.
21     Q.   Did anybody warn you, whether it was your friend
22  or anybody else, that somebody might be looking for you
23  or your car that night?
24     A.   No.
25     Q.   Do you have any idea who might have had reason

**Page 28**

1   to want to attack your car that night?
2      A.   I don't know.
3      Q.   Okay.  That second time that you were leaving
4   with Ann in your car, why was it that you were leaving
5   the Space Station at that point?
6      A.   When the incident happened?
7      Q.   Yes.
8      A.   We were going to go cruise around for a little
9   bit to kill time.
10     Q.   Were you supposed to do something later on that
11  evening?
12     A.   Yes.  I was going to meet up with our friends at
13  Diamond Mall.
14     Q.   At Diamond Mall?  Okay.  Who was it you were
15  going to meet over there?
16     A.   Maria Medina.
17     Q.   Was there any other specific activities planned
18  for that night later that evening?
19          MR. KATCHER:  Well, some of these activities
20  might have to do with driving fast.
21          MR. JOHNSON:  With going fast?
22          MR. KATCHER:  Yeah, so we'd rather not talk
23  about driving fast.
24          MR. JOHNSON:  Okay.
25          MR. KATCHER:  Is it safe to say that the

**Page 29**

1   activities, that it was the Rated R group that was
2   meeting?
3          THE WITNESS:  No.
4          MR. JOHNSON:  Let me just for the record, and
5   specifically let me clarify that any question that I
6   might ask in the future that might have to do with going
7   fast does not mean an illegal activity.  As far as I
8   know, going fast in many circumstances is completely
9   legal, and that's what I'm asking about.
10         MR. KATCHER:  Okay.
11     Q.   (By Mr. Johnson) So what was the specific
12  activity you were planning to do later that night?
13     A.   Just meet up and talk about one of the things we
14  were going to get done to our cars and after that just go
15  cruise around.
16     Q.   How many cars were leaving the Space Station
17  parking lot with you at that time?
18     A.   Just Donny's car and mine.  That was it.
19     Q.   And who was -- at that time, again, this was the
20  time around when Ann was shot, who all was in your car at
21  that time?
22     A.   When the car was going to leave when I had Ann
23  in the passenger seat?
24     Q.   Yes.
25     A.   Just Steven.  He was in the back.  Like on her

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                    June 22, 2006

Page 30

1  backside.
2      Q.  So sitting in the back seat of your car was
3  Steven?
4      A.  Yeah.
5      Q.  What's Steven's last name?
6      A.  I don't remember.
7      Q.  How old of a person was Steven?
8      A.  I believe 16, 15 at the time.
9      Q.  Do you know what race Steven is?
10     A.  Yes, he's Asian.
11     Q.  Asian.  All right.  Was he related to Ann?
12     A.  No, he wasn't.
13     Q.  Do you know if he still lives in Anchorage?
14     A.  Yes.
15     Q.  Do you know how to get ahold of him?
16     A.  Not really, no.
17     Q.  Who was in Donny's car at that time?
18     A.  Lavelle and Lai and that's it.  Caposan was
19  inside the Space Station.
20     Q.  Okay.  Caposan.  You don't know his last name?
21     A.  Sopasath.
22     Q.  I'm sorry?
23     A.  Sopasath.
24     Q.  Sopasath?
25     A.  Sopasath or something like that.

Page 31

1      Q.  S-o-p-a-s-a-t-h?
2      A.  Yes, uh-huh.
3      Q.  Sopasath?
4      A.  Uh-huh.
5      Q.  How old of a person was Caposan?
6      A.  Eighteen.
7      Q.  Eighteen?  Do you know if he still lives in
8  Anchorage?
9      A.  Yes, he does.
10     Q.  Do you have any way of contacting him?
11     A.  907 277-2117.
12     Q.  Is that his cell phone maybe?
13     A.  His house.
14     Q.  House.  Okay.  Do you know Donny Abbott's phone
15  number?
16     A.  I don't talk to him anymore.
17     Q.  Is there a reason you don't talk to Donny
18  anymore?
19     A.  We just don't talk anymore.
20     Q.  Did you have a dispute of some kind with him?
21     A.  No.
22     Q.  And do you still talk with Caposan?
23     A.  Yes, once in awhile.
24     Q.  Has he said anything to you about what happened
25  that night or who shot Ann or why it happened?

Page 32

1      A.  No, he doesn't know anything either.
2      Q.  Okay.  Let's go to the moments right around when
3  Ann was killed.  Can you very specifically just walk us
4  through what happened as you left the Space Station,
5  please?
6      A.  After we were leaving the Space Station, we were
7  outside smoking a cigarette.  And that's when, like I
8  said, people were deciding who is going to go in whose
9  car, and Ann just asked me, oh, do you still want me to
10  drive your car?  I said no.  That's fine.  I'll drive my
11  car.  Thanks.  And her cousin asked us to ask Donny if,
12  you know, she wanted him -- or she wanted to drive his
13  car and he said no.  It's fine.
14      And then we got in our vehicles, and Caposan was
15  still inside the Space Station.  I didn't know about it,
16  and I kind of, you know, wasn't paying attention to
17  that.  I was just trying to leave and Donny pulls out
18  first, and I don't know where he went.  I guess he was
19  waiting for me at the entrance, and that's when I was
20  about to leave.
21      I was going to put it in reverse and that's when
22  I -- Steven told me, he said, hey, wait for Caposan.
23  He's inside the Space Station.  I was like, oh no, he's
24  with Donny.  He said no.  He's at the Space Station.  I
25  was all like, all right.  So we waited a couple minutes

Page 33

1  there, and that's when I said forget this.  I'm going to
2  pick him up in the front.
3      So right when I was putting it back in reverse,
4  that's when I heard gun shots and I ducked down right
5  away and that was it.
6      Q.  And do you know who shot those shots?
7      A.  No, I do not know.
8      Q.  Do you think that they were in a car?
9      A.  I don't know.
10     Q.  Did you hear any cars speeding away or wheels,
11  tires --
12     A.  No, I did not.
13     Q.  -- spinning or anything like that?
14     A.  All I could hear was just gun shots.
15     Q.  How many shots did you hear?
16     A.  About maybe four or five.  That I really don't
17  remember either.
18     Q.  Could you tell where they were coming from?
19     A.  They were coming from behind me.
20     Q.  Let me ask you to draw for us, if you would,
21  where your car was at.
22     A.  Sure.
23     Q.  Maybe you can just draw where the Space Station
24  was and kind of orient us where you were at.
25         (Witness draws a diagram.)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                                          June 22, 2006

---

Page 34

1    A.   That's Spenard right there.
2         MR. KATCHER:  Spenard is spelled S-p-e-n-a-r-d.
3         THE WITNESS:  I believe that's West 27th or
4    something.  That's a little entrance, and there's an
5    exit, and this is the parking lot.  There's cars here.
6    And then there was also a little exit, and there's cars
7    parked here also.
8         This was my vehicle, and this is Donny's
9    vehicle.  He pulled out and got right here.
10   Q.   (By Mr. Johnson)  Let me ask you just because
11   somebody may be looking at this a year from now and not
12   know what's going on -- well, let's mark this Exhibit 2.
13        (Exhibit 2 was marked for identification.)
14   Q.   On Exhibit 2, Mr. Olivo, if you could, let's
15   see, make sure that I understand where everything is at.
16   A.   Okay.
17   Q.   You've written Spenard off on the side.  I
18   assume that's Spenard Road there?
19   A.   Yes.
20   Q.   And then you have a rectangle.  Within it are
21   various lines kind of at the -- well, one of -- there's a
22   little box inside the rectangle that has E.  Is that the
23   entrance to the Space Station?
24   A.   Yes, uh-huh.
25   Q.   Then there's a series of straight lines.

Page 35

1    A.   Those are the vehicles.
2    Q.   These are vehicles parked in a parking lot?
3    A.   Uh-huh.
4    Q.   And maybe can I ask you to put an initial below
5    the line that represents your car and below the one that
6    represents Donny's car.
7    A.   (Witness marks diagram.)
8    Q.   Okay.  So you put a C.O., and I assume that
9    represents your car?
10   A.   Yes.
11   Q.   And a D.A. for Donny's car; is that correct?
12   A.   Yeah.
13   Q.   And then would you mind putting just "EX" beside
14   the two exits out of the parking lot.
15   A.   (Witness marks diagram.)
16   Q.   Then is there one over here onto Spenard there?
17   Okay.  So do I understand correctly that the two cars,
18   your car and Donny's car, were sitting side by side?
19   A.   Yeah.
20   Q.   Donny backs up and pulls around driving in front
21   of the entrance to the Space Station?
22   A.   Uh-huh.
23   Q.   And then out to the exit onto Spenard Road?
24   A.   Uh-huh.
25   Q.   Is that a yes?

Page 36

1    A.   Yes.
2    Q.   Okay.
3    A.   Sorry.
4    Q.   And were there vehicles parked behind your cars
5    along what's been marked West 27th?
6    A.   Yes.  To tell you the truth, I think there were
7    vehicles sometimes parked on the side of the road, but I
8    don't remember if there was any that night.
9    Q.   Okay.  Were there parking spots within the
10   parking lot that would face out onto West 27th?
11   A.   No.
12   Q.   Okay.
13   A.   Some people would park right here inside the
14   Space Station and, you know, like side by side.
15   Q.   So kind of paralleling West 27th?
16   A.   Yes, uh-huh.
17   Q.   Within the Space Station parking lot?
18   A.   Uh-huh.  Or sometimes on the outside of the
19   Space Station parking lot.
20   Q.   And do you remember the night Ann was shot
21   whether or not there were vehicles parked between your
22   car and West 27th?
23   A.   I don't remember.
24   Q.   All right.  Is your car as shown in Exhibit 2 is
25   that the location you were at when the shots were fired?

Page 37

1    A.   Yes, that's correct.
2    Q.   Okay.  And where was Donny's car at the time the
3    shots were fired?
4    A.   He was right here.
5    Q.   That's the little circle with the arrow pointing
6    at the exit on Spenard?
7    A.   Yes.
8    Q.   Do you know if shots were fired at Donny's
9    vehicle that night?
10   A.   Well, at the time, no, I didn't know.  But after
11   I pulled out and was right behind him, I actually -- no
12   I didn't see no shots in his vehicle.
13   Q.   I'm not sure I understood that.  So after you
14   backed out and pulled around behind Donny --
15   A.   Yes.
16   Q.   -- you said you did or did not see shots?
17   A.   I mean at the time, no, I didn't see no shots.
18   I don't know if his vehicle got fired at or anything.
19   Q.   And since that time you've become aware of him
20   being fired at that night?  Donny?
21   A.   No.
22   Q.   Does Donny have the --
23   A.   Rated R sticker?
24   Q.   Rated R sticker up front --
25   A.   Yes.

---

Esquire Deposition Services                3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                              (866) 462-2785                         Fax (702) 699-7138

10  (Pages 34 to 37)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                    June 22, 2006

---

**Page 38**

1     Q. -- in his car? What kind of car does Donny
2  drive?
3     A. Honda Civic coupe, white.
4     Q. Does he still have that car?
5     A. No, he doesn't.
6     Q. Do you know what he drives now?
7     A. No, I don't know.
8     Q. Do you know if he is still a member of the Rated
9  R Racing group?
10    A. No, he's not.
11    Q. Does that group still exist?
12    A. From my beliefs, I don't think it does.
13    Q. And this other fellow you've mentioned, Caposan,
14 was he a member of Rated R Racing?
15    A. Yes.
16    Q. And did he have the sticker in his front
17 windshield also?
18    A. No, he doesn't.
19    Q. Do you know what kind of a vehicle he drives
20 now?
21    A. '98 black Honda Civic coupe.
22    Q. Okay. So you didn't hear any vehicles speeding
23 past; you didn't see anyone; all you heard was shots
24 fired?
25    A. Yeah.

---

**Page 39**

1     Q. At the moment shots were fired, then what did
2  you do?
3     A. I pulled out and I did the same thing Donny
4  did. Went around and I got right behind him, and I was
5  honking, and I told him, hey, get out of the way. And
6  that's when we were right here at the stoplight, and I
7  looked at Ann, and I was like, hey, are you all right?
8     And that's when -- because I heard Steven in the
9  background yelling and screaming, and then that's when,
10 you know, looked at Ann and she was already dead, you
11 know. Lot of blood and everything.
12    And that's when I pulled right up next to Donny to
13 let him know and asked if her cousin had a cell phone or
14 something, and then these other guys -- because we pulled
15 into the Buckeroo or something like that. I don't know.
16 Some little alleyway.
17    And then what's his name, Steven, he jumped out of
18 the back window, and these two guys were just walking,
19 and then they came and helped us and they had a phone or
20 something like that and they called 911, and the police
21 arrived there like a minute later, couple seconds later.
22 They were actually pretty fast this time, and that's
23 about it. Then they took over after that.
24    Q. And when was the first time you realized Ann had
25 been shot?

---

**Page 40**

1     A. Right when I pulled -- like when I was on
2  Spenard waiting for the red light.
3     Q. So you would have been facing -- you were
4  already on Spenard?
5     A. Yes.
6     Q. Is this the red light with --
7     A. Northern Lights, I believe. I think it's
8  Northern Lights.
9     Q. Did Ann say anything after the shots were fired?
10    A. I know when we were in the car and the car was
11 getting shot at, I remember she did a quick little yell
12 like. It was like a second.
13    Q. Mr. Olivo, did Ann say anything to you at any
14 time that evening prior to those shots ringing out that
15 indicated she thought anyone was looking for her or she
16 had a dispute with anyone of any kind?
17    A. No, she never mentioned to me anything like
18 that.
19    Q. Before the shots occurred, did you have any idea
20 from any source that either Ann or yourself or your car
21 was in danger in any way?
22    A. No.
23    Q. When you realized that Ann had been shot, what
24 was she doing at that time?
25    A. When she was shot already?

---

**Page 41**

1     Q. Yeah, when you first realized she had been
2  injured in some way.
3     A. She was sitting straight in the car with her
4  seat belt on, I believe, and her head was kind of tilted
5  like this on the headrest, and -- I don't know. She
6  looked -- that's the reason why I thought that she was,
7  you know, still alive because I mean from my glimpse of
8  my eye, you know, all I saw was, you know, like her
9  sitting there straight.
10    So I was just basically trying to get us out of
11 harm, and that's when I realized. Like I started asking
12 her, hey, are you all right? And she wasn't responding.
13 And I looked over and that's when I just saw, you know,
14 everything was really bloody, and her glasses were all,
15 you know, filled with blood. And from somewhere there
16 was a lot of blood was pouring out like a waterfall.
17 That's all I remember.
18    Q. Did she move or do anything else after that?
19    A. When I was turning onto West 27th -- not West
20 27th. Sorry. When I was turning into the Buckeroo or
21 something, that's when she fell on me and that's when,
22 you know, I kind of put her back onto the seat, and then
23 we all got out and tried to see if she was all right.
24    Q. When she fell onto you, do you think she was
25 still alive at that point?

---

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                      June 22, 2006

---

**Page 42**

1      A.  No.  She was completely gone.  Her mouth was
2   wide open, and --
3      Q.  Have you ever been around a shooting before this
4   incident happened?
5      MR. KATCHER:  Okay.  You want to know if he's
6   ever been around an incident when shots were fired?
7      MR. JOHNSON:  Uh-huh.
8      MR. KATCHER:  Let's go off the record.
9      (Break was taken.)
10      MR. KATCHER:  Back on the record.  Could you
11   repeat the question?
12      THE REPORTER:  "Have you ever been around a
13   shooting before this incident happened?"
14      THE WITNESS:  No.
15      Q.  (By Mr. Johnson) Are you aware of other shooting
16   attacks against vehicles in Anchorage other than this one
17   where Ann was killed?
18      MR. KATCHER:  Well, hang on.  You want to know
19   whether he's aware of any shooting attacks that have ever
20   happened in Anchorage, Alaska before or after this
21   incident?
22      MR. JOHNSON:  Yes.  I'll refine the question
23   once we get the basic foundation here.
24      MR. KATCHER:  You can go ahead and answer that
25   question.

**Page 43**

1      THE WITNESS:  I think I probably seen it in the
2   news.
3      Q.  (By Mr. Johnson) Have you ever personally been a
4   witness to any other shootings in Anchorage other than
5   when Ann was killed?
6      MR. KATCHER:  Well, all right.  Go ahead.
7      Q.  (By Mr. Johnson) And I think you've testified
8   that you didn't know anyone was after you that night.
9   Had you been attacked by anyone in the prior month or two
10   in any way?  Somebody -- well, in any way physically?
11      MR. KATCHER:  Hang on.  Let's go off the
12   record.
13      (Break was taken.)
14      MR. KATCHER:  Let's go back on the record, and
15   can we have the question again, please.
16      THE REPORTER:  "And I think you've testified
17   that you didn't know anyone was after you that night.
18   Had you been attacked by anyone in the prior month or two
19   in any way?  Somebody -- well, in any way physically?"
20      THE WITNESS:  No.
21      Q.  (By Mr. Johnson) After Ann was killed, have you
22   learned anything since then about why someone was
23   shooting at your car?
24      A.  No.
25      Q.  Has anyone suggested to you reasons why they

**Page 44**

1   think someone might have been shooting at your car?
2      MR. KATCHER:  You're asking whether anybody said
3   to him anything about why anyone was shooting at his
4   car?
5      MR. JOHNSON:  Yes.
6      THE WITNESS:  I don't remember.
7      Q.  (By Mr. Johnson) When you say you don't
8   remember, is it you don't remember what somebody said or
9   if anybody at all said anything?
10      A.  That there was just a lot of different rumors
11   going around, so...
12      Q.  What are some of the rumors?  What's the word on
13   the street?
14      A.  Something about Ann wanting to set me up, and
15   things about Steven looking like somebody else, and
16   that's pretty much all I can remember.  Oh, yeah, and
17   also people not liking Ann.
18      MR. KATCHER:  People not what?
19      THE WITNESS:  Not liking Ann.  Like they didn't
20   really like her.
21      Q.  (By Mr. Johnson) Do you know who those people
22   were?
23      A.  I don't even know who they were.  It was just,
24   you know, words just getting tossed around.
25      Q.  Do you remember any specific person that

**Page 45**

1   suggested any of these or other theories on why it
2   happened?
3      A.  No.
4      Q.  Let's go back to right before the shots rang out
5   as you're sitting there in your car.
6      A.  Uh-huh.
7      Q.  Was the car running?
8      A.  Yes, it was.
9      Q.  And did you have music on or the radio on?
10      A.  That I honestly don't remember.
11      Q.  Okay.  This was in November; correct?
12      A.  Yes.
13      Q.  Do you recall did you have the windows open or
14   closed?
15      A.  They were closed.  It was pretty cold.
16      Q.  Were there lots of people in the parking lot at
17   that time?  Do you remember?
18      A.  There was a lot of cars.  It was a Friday night,
19   I believe, and there's always a lot of people always
20   hanging out like at the front entrance.  Some people
21   walking by, things like that.
22      Q.  What about behind your car?  Do you remember
23   people passing by on foot or in their cars?
24      A.  No, because it's always busy back there in the
25   Bear Tooth and things like that.

---

Esquire Deposition Services              3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                          (866) 462-2785                          Fax (702) 699-7138

12  (Pages 42 to 45)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                          June 22, 2006

---

**Page 46**

1    Q.  How do you think they got close enough to shoot
2    your car?
3        MR. KATCHER:  Well, speculation.
4        MR. JOHNSON:  Of course.  Go ahead.
5        THE WITNESS:  Well, I mean that West 27th is
6    pretty close to the parking lot, so that's my only guess.
7    Q.  (By Mr. Johnson)  Do you remember seeing anybody
8    in your rear view mirror?
9    A.  No.  I ducked down right away.
10   Q.  And when the shots stopped coming, did you look
11   to see where they had come from?
12   A.  No.  I was just wanting to go get out of there
13   and, you know, that was pretty much it.  I just wanted to
14   get out of there.
15   Q.  Well, did you look back when you put your car in
16   reverse to back up out of the parking spot and then pull
17   around?  Did you look back behind you at that point?
18   A.  Yes.  But I only looked back enough for me to
19   see just if I was going to hit another car or anything or
20   if I was going to hit anything in my way.  That was it.
21   Q.  I believe I asked you about attacks against you
22   prior to the incident.  Has there been any attacks
23   against you after Ann was killed?
24       MR. KATCHER:  Off the record.
25       (Break was taken.)

---

**Page 47**

1        MR. KATCHER:  Back on the record and please
2    repeat the question.
3        THE REPORTER:  "I believe I asked you about
4    attacks against you prior to the incident.  Has there
5    been any attacks against you after Ann was killed?"
6        MR. KATCHER:  And I'm going to instruct him not
7    to answer on the basis of the privilege against self-
8    incrimination.
9        MR. JOHNSON:  Okay.  Well, all right.  It's
10   short-lived on the record.  Let's go off for a second.
11   John, why don't you and I chat for a second.
12       (Break was taken.)
13       MR. KATCHER:  All right.  Back on the record.
14   Could you read back the last exchange, the last question
15   and response, please.
16       (The record was read by the reporter.)
17   Q.  (By Mr. Johnson)  Mr. Olivo, well, I guess I need
18   to ask you if you're going to answer that question.  Your
19   counsel has instructed you not to.  Are you going to
20   answer the question?
21   A.  No.
22   Q.  Have you discussed this issue with law
23   enforcement people about possible altercations since
24   Ann's death?
25       MR. KATCHER:  Well, it's vague, and it also

---

**Page 48**

1    could, again, be a link in the chain that is potentially
2    incriminating, so I'm going to instruct him not to answer
3    that question as well.
4        MR. JOHNSON:  Whether or not he talked to police
5    about it?
6        MR. KATCHER:  Yes.
7        MR. JOHNSON:  Okay.  Well, what I'm trying to do
8    is lay a foundation so that we can go talk to Judge
9    Gleason about it later on and have it on the record of
10   what it is we're talking about.
11       MR. KATCHER:  Right.
12       MR. JOHNSON:  So perhaps maybe you would like to
13   make a statement that you feel is safe so that we can
14   give the judge what it is that we're talking about so she
15   can make an informed decision.
16       MR. KATCHER:  Well, I guess I'm not going to
17   allow him to answer any questions that in any way relate
18   to the subject matter that was addressed in your
19   question, and that would include any interactions that he
20   had with law enforcement related to the subject matter
21   that is addressed in your question, the question to which
22   I asserted the privilege originally.
23       MR. JOHNSON:  And are you instructing him not to
24   answer as to timing of whether or not anything happened
25   as well?

---

**Page 49**

1        MR. KATCHER:  Yes.
2        MR. JOHNSON:  Okay.
3        MR. KATCHER:  Well, the timing is premised in
4    the question.  The question was after the incident of
5    November 2003; correct?
6        MR. JOHNSON:  Yes.  However, what I would like
7    to do is provide the judge information as to the
8    proximity in time of other altercations or other
9    investigations by the police to the death of Ann Saephan
10   for the purpose of her being able to tell whether or not
11   there's something that's relevant that's not protected by
12   his privilege.
13       MR. KATCHER:  And I'm not going to do that on
14   the record.
15       MR. JOHNSON:  So you're instructing him not to
16   answer that?
17       MR. KATCHER:  Exactly.
18   Q.  (By Mr. Johnson)  And my next question is have
19   you given at any time since the death of Ann Saephan a
20   recorded statement to law enforcement officers.  Period.
21       MR. KATCHER:  Let's go off the record, please.
22       (Break was taken.)
23       MR. KATCHER:  Back on the record.  Let's have
24   the question again, please.
25       THE REPORTER:  "And my next question is have you

---

Esquire Deposition Services          3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                        (866) 462-2785                         Fax (702) 699-7138

13 (Pages 46 to 49)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                  June 22, 2006

## Page 50

1  given at any time since the death of Ann Saephan a
2  recorded statement to law enforcement officers. Period."
3          MR. KATCHER: He can go ahead and answer that
4  question.
5          THE WITNESS: Yes.
6       Q.  (By Mr. Johnson) And was the statement related
7  to the death of Ann Saephan or to some other incident?
8       A.  It was related to Ann Saephan.
9       Q.  Okay. Do you remember what officer you gave the
10 statement to?
11      A.  Detective -- if I was to hear his name, I would
12 remember. But not offhand, no, I don't remember.
13         MR. KATCHER: Do you want -- I think I have the
14 initial disclosure somewhere.
15         MR. JOHNSON: If you do, that would be helpful.
16 Do you remember his name? I don't remember his name.
17         MR. KATCHER: I think I purposely didn't bring
18 them. Why don't we go off the record.
19         (Brief pause in proceedings.)
20      Q.  (By Mr. Johnson) Back on the record. Do you
21 recognize the name of officer Ron McGee?
22      A.  No.
23      Q.  How about officer Robert Blanton?
24      A.  No. Now, wait a minute. The recorded statement
25 is that in the vehicle or inside the police station?

## Page 51

1       Q.  I don't know.
2       A.  Because I don't remember if he had a little tape
3  recorder inside the police vehicle when they took us, but
4  I think they did do a statement inside the police station
5  when we had separate rooms. And I remember for that one
6  it was Detective -- I don't --
7       Q.  Okay. Some detective at the Anchorage Police
8  Department.
9       A.  Like if I heard his name, I would know who he
10 is.
11      Q.  I might too. And so that was the recorded
12 statement inside the police station to a detective for
13 the Anchorage Police Department. When was that?
14      A.  That's when that happened.
15      Q.  It was the same night Ann was killed?
16      A.  Yes, uh-huh.
17      Q.  And then you think you may -- well, you talked
18 to a police officer, and the officer may have been
19 recording it as you were sitting in his patrol car,
20 again, right after Ann was killed; is that correct?
21      A.  Yes.
22      Q.  Have you given any other statements to the
23 Anchorage Police Department since the date of Ann's
24 death?
25      A.  No.

## Page 52

1       Q.  Another possible name of a police officer is
2  Officer Tim Landise.
3       A.  Yes, that's the detective.
4       Q.  So it was Officer Landise that took a recorded
5  statement from you after Ann's death?
6       A.  Yes.
7       Q.  Have you given any statements to anyone else
8  about Ann's death?
9          MR. KATCHER: Other than me?
10      Q.  (By Mr. Johnson) Other than Mr. Katcher
11 regarding Ann's death.
12      A.  No, not that I remember.
13      Q.  Backing up to our earlier question, have you
14 talked to the police about other altercations you had in
15 Alaska since Ann's death?
16         MR. KATCHER: And he's going to assert the
17 privilege on that.
18         MR. JOHNSON: Okay. And I don't remember what
19 the record shows, but is the privilege also that's being
20 asserted covering the timing of any such investigations?
21         MR. KATCHER: Correct.
22         MR. JOHNSON: All right. And counsel, for the
23 court are you asserting the privilege as to whether or
24 not a statement was given or to what the statement was?
25         MR. KATCHER: Both.

## Page 53

1          MR. JOHNSON: And can we stipulate on the record
2  that if at some point the court looks at this and says
3  that we're entitled to find out about other
4  investigations or other altercations that Mr. Olivo will
5  be made available for deposition to continue with that
6  line of questioning if the court says we are able to do
7  so?
8          MR. KATCHER: We will make him available.
9       Q.  (By Mr. Johnson) Looking at Exhibit 1 to this
10 deposition, Mr. Olivo, there are some names listed here,
11 and we've already covered some of them, I think, but
12 let's go down it.
13         Concerning persons who may have relevant information
14 concerning the incident in which Ann died, you have
15 listed Billy. Do you know Billy's last name?
16      A.  No, I don't.
17      Q.  What involvement did Billy have with what
18 happened?
19      A.  I don't know.
20      Q.  Who is Billy?
21      A.  Just somebody that --
22      Q.  Okay. This is a list of people that you have
23 produced. These people may have relevant information.
24 Billy's name is on here because you thought he might know
25 something. What is it you think he might know about?

Esquire Deposition Services          3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                      (866) 462-2785                              Fax (702) 699-7138

14  (Pages 50 to 53)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                June 22, 2006

## Page 54

1      MR. KATCHER: Counsel, I think you're actually
2   mischaracterizing what the list says. The list says
3   that, if I may read it for the record.
4      MR. JOHNSON: Uh-huh.
5      MR. KATCHER: That defendant has heard rumors
6   that Billy was involved in the incident.
7   Q.  (By Mr. Johnson) Okay. Well, and that's fine.
8   Rule 26 calls for a listing of persons who have or may
9   have information relevant to the issues in the case. His
10  name is on here. What rumors have you heard about Billy
11  and his involvement?
12  **A.  Just that he might be part of it.**
13  Q.  In terms of the attack itself?
14  **A.  Yes.**
15  Q.  And in the rumors you have heard, you heard who
16  Billy is or anything about him?
17  **A.  Just that he was part of, he could be part of**
18  **it.**
19  Q.  And do you know who this Billy is? I mean is
20  this a person that you are aware of?
21  **A.  Yes.**
22  Q.  Okay. And how is it that you're acquainted with
23  him or you know who he is?
24  **A.  I just know who he is.**
25  Q.  Who was it that told you that Billy may have

## Page 55

1   been part of it?
2   **A.  Lavelle.**
3   Q.  Okay. What's Lavelle's last name?
4   **A.  I don't know.**
5   Q.  Is it Lavelle Papillon?
6   **A.  Yes, Papillon.**
7   Q.  Can you describe who Billy is for me?
8   **A.  Like describe him as in how what he looks like?**
9   Q.  Sure. Let's start there.
10  **A.  He's Asian. He's short. Well, not really short**
11  **but average. Also average on weight.**
12  Q.  Do you know how old he is?
13  **A.  Like 18.**
14  Q.  Does he live there in Anchorage?
15  **A.  I don't know. Yeah, at the time.**
16  Q.  At the time of the incident he did?
17  **A.  Uh-huh.**
18  Q.  And who did he hang out with?
19  **A.  That I personally don't know who he hangs out**
20  **with. I mean he's not my friend.**
21  Q.  Did you see him with anybody else that you know?
22  **A.  Can we take a break on this one?**
23      MR. JOHNSON: Sure. Sure.
24      (Break was taken.)
25      MR. KATCHER: Okay. We're back. Please repeat

## Page 56

1   the question.
2      THE REPORTER: "Did you see him with anybody
3   else that you know?"
4      THE WITNESS: Yes.
5   Q.  (By Mr. Johnson) And who was that?
6   **A.  Johnny and Memo, M-e-m-o.**
7   Q.  Okay. Do you know Johnny's last name?
8   **A.  No, I don't.**
9   Q.  Do you know Memo's last name?
10  **A.  No.**
11  Q.  Was that in Anchorage?
12  **A.  Yes.**
13  Q.  Do you know if Johnny still lives in Anchorage?
14  **A.  No.**
15  Q.  How about Memo?
16  **A.  I don't know.**
17  Q.  Do you know if Billy or have you heard rumors
18  even that Billy was upset with you or with Ann or with
19  Steven?
20  **A.  No, I didn't hear no rumors.**
21  Q.  And do you know yourself of Billy being upset
22  with any of the three of you who were in the car that
23  night?
24  **A.  That I don't know.**
25  Q.  Are you aware of any reason that Billy would

## Page 57

1   have been after any of the three of you in the car that
2   night?
3   **A.  No.**
4   Q.  Next person on the list is Memo. Is this the
5   same person you were just referring to?
6   **A.  Yes.**
7   Q.  And what rumors have you heard about Memo
8   possibly being involved in the incident?
9   **A.  Same thing as Billy.**
10  Q.  Same question then. Do you know of any reason
11  that Memo would have been upset with any of the three of
12  you in your vehicle that night?
13  **A.  No.**
14  Q.  Have you ever had any sort of dispute with
15  either Memo or Billy?
16      MR. KATCHER: He's going to assert the
17  privilege.
18      MR. JOHNSON: Same stipulation?
19      MR. KATCHER: Yes. Well, just to make sure, to
20  make him available?
21      MR. JOHNSON: Yes.
22      MR. KATCHER: Yes. That applies to any
23  questions that happen in this deposition today.
24      MR. JOHNSON: All right.
25  Q.  (By Mr. Johnson) Do you know are Billy and Memo

Esquire Deposition Services           3900 S. Paradise Road Suite 156          Las Vegas, Nevada 89109
Phone (702) 699-5455                        (866) 462-2785                     Fax (702) 699-7138

15  (Pages 54 to 57)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

## Page 58

1 still alive?
2   **A. I don't know.**
3   Q. You don't know of them being dead; right?
4   **A. No.**
5   Q. Do you know anyone who knows Memo?
6   **A. From the people I know, no, they don't know.**
7   Q. Next name on the list is Johnny. Who's Johnny?
8   **A. Friends of Billy's and Memo's.**
9   Q. What have you heard as to Johnny's possible
10 involvement?
11   **A. Exact same thing.**
12   Q. Exact same thing that he may have been involved?
13   **A. Uh-huh.**
14   Q. Have you heard that he may have been involved in
15 the actual attack?
16   **A. From the rumors, that's all I heard, that he may**
17 **be involved.**
18   Q. What rumors did you hear?
19   **A. That he was the one who shot Ann.**
20   Q. Have you had any disputes with Johnny?
21   MR. KATCHER: Same privilege asserted. Same
22 stipulation.
23   Q. (By Mr. Johnson) Next name is Clayton. Who's
24 Clayton?
25   **A. Friends of ours.**

## Page 59

1   Q. Friends of Billy's, Memo's, and Johnny's?
2   **A. Yes.**
3   Q. What rumors have you heard about Clayton's
4 possible involvement?
5   **A. Exact same thing, that he could have been**
6 **involved.**
7   Q. Did you see any of those four, Clayton or Johnny
8 or Memo or Billy, on the night that Ann was killed?
9   **A. No, I didn't.**
10   Q. Did you see -- well, did you see any of them
11 prior to Ann being killed?
12   MR. KATCHER: That night?
13   MR. JOHNSON: We'll start with that night.
14   THE WITNESS: No.
15   Q. (By Mr. Johnson) And in the month before?
16   MR. KATCHER: Did he see them?
17   Q. (By Mr. Johnson) You can go ahead and answer.
18   **A. I don't remember.**
19   Q. Did you know of Ann having any disputes with
20 either Clayton, Johnny, Memo, or Billy?
21   **A. I don't know.**
22   Q. You're not aware of any?
23   **A. No.**
24   Q. Okay. And Steven, the person who was also in
25 your car that night at the time of the killing, are you

## Page 60

1 aware of Steven having any disputes with Clayton, Johnny,
2 Memo, or Billy?
3   **A. Yes.**
4   Q. And can you tell me about that?
5   **A. From what I know was that him and Billy got in a**
6 **fight. I believe it was a year ago or a year ago from**
7 **that incident.**
8   Q. So prior to Ann being shot?
9   **A. Uh-huh.**
10   Q. Is that right?
11   **A. Yes.**
12   Q. And which of those -- well, maybe you already
13 said. You said it was Johnny?
14   **A. No, Billy.**
15   Q. Billy?
16   **A. Billy and Steven.**
17   Q. And the fight between Billy and Steven was that
18 a fist fight?
19   **A. That I don't know. I wasn't there.**
20   Q. Are you aware of there being guns involved?
21   **A. I don't know.**
22   Q. Do you know what the dispute or the fight
23 between Billy and Steven was about?
24   **A. No.**
25   Q. Was Billy a member of the Rated R Racers?

## Page 61

1   **A. Billy? No, he wasn't.**
2   Q. How about Memo? Was he a member of Rated R
3 Racers?
4   **A. No.**
5   Q. And Johnny?
6   **A. No.**
7   Q. Or Clayton?
8   **A. No.**
9   Q. Were they members of a different racing group?
10   **A. Not that I know of, no.**
11   Q. Were they part of any other group that you're
12 aware of?
13   **A. Yes.**
14   Q. And what group is that?
15   **A. FTC.**
16   Q. FTC? What does that stand for?
17   **A. Full Time Criminals.**
18   Q. What's that group about? I don't know what that
19 is. Can you tell me what it is?
20   **A. It's from my belief a gang.**
21   Q. In Anchorage?
22   **A. Uh-huh.**
23   Q. Let's see. I asked you about Billy. Can you
24 describe Memo for me?
25   **A. Mexican male, 17 years old, short, skinny.**

Esquire Deposition Services
Phone (702) 699-5455

3900 S. Paradise Road Suite 156
(866) 462-2785

Las Vegas, Nevada 89109
Fax (702) 699-7138

16 (Pages 58 to 61)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                                June 22, 2006

---

Page 62

1   That's all I can remember.
2   Q.   Did Memo have a car at the time Ann was killed?
3   A.   Not that I know.
4   Q.   And did Billy have a car at the time that Ann
5   was killed?
6   A.   That I don't know either.
7   Q.   How about Johnny?
8   A.   Yes.
9   Q.   What kind of car did Johnny have?
10  A.   Red Acura Integra.
11  Q.   Anything distinctive about it?
12  A.   Not that I really know.  Just it had tinted
13  windows.
14  Q.   Did it have any sort of stickers or words or
15  anything?
16  A.   No, not that I know of.
17  Q.   And can you describe Johnny for me?
18  A.   Pacific Islander, little bit chunky, short, and
19  20 years old, 21.
20  Q.   And you have heard rumors that it may have been
21  Johnny that actually did the shooting?
22  A.   Yeah.
23  Q.   And have you heard the rumors that it was
24  Johnny's car they were in that night?
25  A.   No, I didn't hear no rumors about that.

---

Page 63

1   Q.   And Clayton?  Can you describe Clayton for me?
2   A.   Also Pacific Islander.  Short, pretty chunky, 16
3   years old.
4   Q.   When you say short -- I'm sorry.  How tall are
5   you?
6   A.   I'm five-eleven.  Let's see.  Maybe like five-
7   one.
8   Q.   Clayton was five-one or so?
9   A.   Uh-huh.
10  Q.   And Johnny?  About how tall is he?
11  A.   Like maybe five-three.
12  Q.   And Memo?
13  A.   Memo would be about five-three also.
14  Q.   And Billy?
15  A.   Five-five.
16  Q.   Have you heard any rumors about how they might
17  have approached your car to shoot those shots that night?
18  A.   No.
19  Q.   Caposan.  You've talked about him.  Who is
20  Caposan?
21  A.   What was that?
22  Q.   Describe Caposan for me, please.
23  A.   Asian, short, about five-three, five-four.
24  Really skinny.  And that's all.
25  Q.   About how old is he?

---

Page 64

1   A.   Oh, about 18.
2   Q.   Lavelle.  Let me back up.  Are you aware of any
3   disputes between Caposan and Ann or Steven or yourself?
4   A.   No.
5   Q.   Okay.  Caposan was your friend; is that right?
6   A.   Yes.
7   Q.   Friend of Ann as well?
8   A.   Just more like an acquaintance.
9   Q.   Okay.  Friends of Steven?
10  A.   Yes.
11  Q.   Lavelle Papillon?  Where was he at the time of
12  the shooting?
13  A.   He was in Donny's car.
14  Q.   Can you describe Lavelle for us?
15  A.   Sure.  Five-five, pretty skinny, black male,
16  about 17 years old.  18 actually.
17  Q.   Okay.  Are you aware of any disputes that
18  Lavelle had with Ann or Steven or yourself?
19  A.   No.
20  Q.   Was he one of your friends?
21  A.   Yes.
22  Q.   Are you aware of anybody else that had any
23  dispute with Ann or Steven that night?
24  A.   Not that I know of.
25  Q.   Okay.  Have you heard what Johnny used to do the

---

Page 65

1   shooting?
2   A.   No.
3   Q.   Can you tell us of anybody who might have
4   information about Johnny or Clayton or Billy's or Memo's
5   involvement in the shooting?
6   A.   That I don't know either.
7   Q.   Is there anything else about Ann's death or why
8   it happened that you know of that I haven't asked you
9   about?
10  A.   No, not that I know.
11  Q.   Okay.  Let me ask you a couple real quick
12  questions about insurance coverage and then I'm about
13  done.
14       When you bought your Leader policy, do you remember
15  that?
16  A.   Yes.
17  Q.   And did you buy that in person or over the
18  phone?
19  A.   In person.
20  Q.   Where did you go to buy it?
21  A.   The address I don't really remember.  It was
22  actually on Northern Lights.
23  Q.   Talked with an agent from Leader about it?
24  A.   Yes.
25  Q.   Pardon me.  Your insurance policy from Leader

---

Esquire Deposition Services          3900 S. Paradise Road Suite 156       Las Vegas, Nevada 89109
Phone (702) 699-5455                      (866) 462-2785                 Fax (702) 699-7138
                                                                      17 (Pages 62 to 65)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo                                                        June 22, 2006

## Page 66

1  has been produced in this case. There's a section in it
2  about underinsured motorist coverage where it gives the
3  following definition.
4     It says: An underinsured motor vehicle is a motor
5  vehicle for which there is a bodily injury or property
6  damage policy or liability bond available at the time of
7  the auto accident with less than the limits of liability
8  shown in the declarations of this policy for under-
9  insured motorist coverage.
10    Was that your understanding of what underinsured
11 motorist coverage was when you bought your policy?
12    **A. I believe so. I really don't pay attention to**
13 **that stuff. I just want to get the insurance and get out**
14 **of there.**
15    Q. Did anybody else when you bought your policy
16 explain that there was a different definition for under-
17 insured motorist coverage to you?
18    **A. That I don't remember.**
19    Q. So you're not aware of anybody else telling you
20 that there was any other definition than this one in the
21 policy; is that correct?
22    **A. Yes.**
23    Q. Since that time, either prior to Ann's death or
24 since then, did anybody explain to you that that
25 definition of underinsured motorist policy is contrary to

## Page 67

1  Alaska law?
2     **A. I don't remember.**
3     Q. You're not aware of anybody informing you of
4  that; right?
5     **A. I don't remember.**
6     MR. JOHNSON: Thanks, Mr. Olivo.
7     MR. KATCHER: I don't have any questions.
8     MR. JOHNSON: Counselor, you haven't entered an
9  appearance, but would you like to ask any questions
10 here?
11    MS. HOZUBIN: I would like to go off the record
12 and step out in the hall with Mr. Katcher.
13    (Break was taken.)
14    MS. HOZUBIN: Everyone will be happy to know I
15 have no questions.
16    Q. (By Mr. Johnson) I thought of one I need to ask
17 just for the record. I certainly know the answer, but,
18 Mr. Olivo, are you aware of anybody else who may be a
19 witness or may have seen or heard anything having to do
20 with the shooting that night?
21    **A. No.**
22    MR. JOHNSON: Okay.
23    MR. KATCHER: We're done.
24    MR. JOHNSON: Thank you.
25    MR. KATCHER: We'll read and sign, and you can

## Page 68

1  do it through my office. You can send it to me and we'll
2  arrange for it.
3     (Discussion off the record regarding ordering
4  copies of the transcript.)
5     MR. JOHNSON: Under our rules up there, it's
6  when and if somebody orders a copy and it's transcribed,
7  then he ends up having 30 days from the time you send it
8  out to him.
9     (The deposition concluded at 2:18 p.m.)

## Page 69

1                    CERTIFICATE OF WITNESS
2  PAGE   LINE      CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14         * * * * *
15 I, CHARLES OLIVO, witness herein, do hereby certify
   and declare the within and foregoing transcription to be
16 my deposition in said action; that I have read,
   corrected, and do hereby affix my signature to said
17 deposition.
18
19 _____
            CHARLES OLIVO
20
21 STATE OF NEVADA        )
                          SS:
22 COUNTY OF CLARK        )
23   Subscribed and sworn to before me this ____ day of
   _____, 2006.
24
25        _____
              Notary Public

Esquire Deposition Services        3900 S. Paradise Road Suite 156        Las Vegas, Nevada 89109
Phone (702) 699-5455                     (866) 462-2785                    Fax (702) 699-7138
18  (Pages 66 to 69)

c1497ca6-cdee-4b5c-be98-9ea3cc51b829

Charles Olivo

June 22, 2006

Page 70

```
 1          REPORTER'S CERTIFICATE
 2   STATE OF NEVADA )
                     ) ss.
 3   COUNTY OF CLARK )
 4       I, CHRISTINE M. JACOBS, a duly commissioned Notary
     Public, Clark County, State of Nevada, do hereby certify:
 5   That I reported the deposition of the witness, CHARLES
     OLIVO, commencing on Thursday, June 22, 2006, at
 6   12:00 p.m.
 7       That prior to being deposed, the witness was by me
     duly sworn to testify to the truth.  That I thereafter
 8   transcribed my said stenographic notes via computer-aided
     transcription into written form, and that the typewritten
 9   transcript of said deposition is a complete, true, and
     accurate transcription of said stenographic notes.  That
10   review of the transcript was requested.
11       I further certify that I am not a relative,
     employee, or independent contractor of counsel of any of
12   the parties; nor a relative, employee, or independent
     contractor of the parties involved in said action; nor a
13   person financially interested in the action; nor do
     I have any other relationship with any of the parties or
14   with counsel of any of the parties involved in the action
     that may reasonably cause my impartiality to be
15   questioned.
16       IN WITNESS WHEREOF, I have hereunto affixed my hand
     in my office in the County of Clark, State of Nevada,
17   this 3rd day of July 2006.
18
19
20          CHRISTINE M. JACOBS, CCR 455
21
          22
23
24
25
```

c1497ca6-cdee-4b5c-be98-9ea3cc51b829